Nassel, will you please approach the podium, tell us who you are, who you represent, and about how much time you need. Good morning, Your Honors. Miles J. Zaremsky, together with Myron Mackoff on behalf of Petitioner Appellant Joseph Kamelgard, M.D. I would imagine I would take, for my main argument, 15 to 17 minutes, with rebuttal time reserved. Nassel. Good morning, Your Honors. Steve Mandel on behalf of the American College of Surgeons. I suspect I'll need about 15 minutes. We have read your briefs and looked at the cases. I would suggest you hit what you consider your strong points, and we will not hesitate to interrupt and tell you what we think is strong and ask your questions on. So let's proceed, counsels. Good morning, Your Honors. Again, I am Miles Zaremsky, together with Myron Mackoff, representing Dr. Joseph Kamelgard. Your Honor, the crux of our main argument will focus in on the Medical Studies Act as a matter of law, but before I get to that, I would like to address ever so briefly, if I can, two other preliminary points. In any analysis of the Medical Studies Act, it requires a two-pronged analysis. First is, does the statute as a matter of law apply, which we will get to. And the second prong is whether the matters being claimed as privilege fall within the four corners of the statute in a factual sense. Quite frankly, Your Honors, and it's made quite clear in the briefs, in our briefs, Dr. Paul Collicott was not a member of the college's peer review committee. Dr. Collicott has admitted that. His former counsel for the college has admitted that. I don't think that's an issue. And Dr. Collicott selected the three names that we are seeking pursuant to our Rule 224 petition. With that, the trial judge, Judge Dooling, said that the committee gather information just like the committee in Anderson v. Rush Copley did. And quite frankly, since the committee in our case didn't know that they were supposed to do that, then it's hard for them to gather information. I think that's quite logical. But more instructive on that point is Roche v. Springfield Clinic. Our Illinois Supreme Court in the 1990s was faced with, quite frankly, a situation quite on point, where Memorial Hospital in that case claimed a privilege under the Medical Studies Act of Dr. Draper, who happened to be department chair of the Department of Anesthesiology. And Dr. Draper had interviewed a couple of nurse witnesses at the time. Our Supreme Court said, and let me quote quite briefly, Memorial's theory also fails because it presupposes that Draper's investigation was tantamount to an investigation by a committee. The term committee is never specifically defined in the statute, so we must give it its ordinary and popularly understood meaning. As generally understood, a committee is comprised of a body or group of persons, not just a single individual. As we have just discussed, the only committee here was the anesthesia department, and Draper spoke to Denninger and Funk, those were the two individuals at the hospital, before that department was even made aware of the problem. We have not found, and Memorial has not cited, any legal principle which would warrant imputing Draper's actions here to the department, simply because he served as its chair. And so last night, I had all my notes, all the cases, and I set them all aside and I said, let's just look at this practically. I want to ask some questions. Do you feel that medical, what's it, the Medical Studies Act, does it apply to your client? The Medical Studies Act does not, as a matter of law, apply to Dr. Camelgard. That is our position. And we were going to address that point after I. Okay, I just want to get that down. You did not raise it in your opening brief, as I recall. We did. We emphasized it as the second. That's correct. In our opening brief, we did not. The college chose to. Is it waived then or not? No, it is not waived. And, in fact, the college raised the purpose, as a matter of law, of the statute in its response brief. We then included it in our reply. The college moved to strike our reply, and this court denied that motion. I looked at judicial review, and I looked at the ARDC review, and was this, there was a complaint filed by the committee. Is that right? The committee, the college's committee, did file a complaint against Dr. Camelgard. So a complaint was voted upon, and at that time, was it public? It wasn't public at all. Was it general public? Your Honor, we have discovery that we have developed that that action did become public. It became public, but who caused it? Well, we have a doctor that we've developed. We took a deposition of a doctor in Louisiana who was aware of what went on in the college. Now, the question that Justice Murphy is asking is who caused that? Who caused? Well, we haven't gotten to that stage of who caused the dissemination. Well, let me ask you, of course, these complaints. The complaint was filed, and does it remain confidential by the rules? According to the college, that complaint is supposed to remain confidential. But what stage does it become public? There has to be a hearing. What had happened factually, Justice Murphy, was that the complaint, after seven months of investigation, complaint was filed in October of 06, formal charges of unprofessional conduct. I was retained in December of 06. I wrote a lengthy letter to the college on behalf of Dr. Camelgard. I believe at the end of December of 06 or first week in January, we received notice that the hearing, which was scheduled for February of 07, was going to be stayed or postponed until June of 07. So if they were going to have a hearing and it's held in chambers, it's not public? I don't know any process within the American College of Surgeons as to the hearing itself, where it takes place, who is present. You know, that really wasn't developed. Dr. Camelgard, I believe, had received a letter that he could attend. There may not be any witnesses, but, you know, and I'm not even sure whether I could as counsel attend as well. So we didn't get to that point, certainly. So you don't know what it would be like? Is there a discovery before this hearing? Honestly, I don't know. All I know is the documents that they had, that they reviewed. There are five members, none of whom were from Illinois, and I don't know when they reviewed them or whether they're at their home state when they reviewed them. You know who the members were. They voted the complaint. There are five members of their committee. If it went to a hearing, you would know who those hearing officers were. Well, the college discloses who sits on their peer review committee. So we knew the five members. One was from Washington, California, New York, Pennsylvania, and Texas, I believe. It's in the record at 382 to 388, for your honor. Once this committee met the first time in February of 07, I think, they then said that they would take no further action. No, what had happened was after I wrote this letter, in October of 06, Dr. Camelgard was charged. We are going to have a hearing in February of 07. In December, I get retained, or a firm gets retained, and I write a lengthy letter, and as a result of that letter, the hearing is postponed. The February 07 hearing is postponed to June of 07 at the Iliadus. And I'm paraphrasing those words. Then on March 2nd or March 3rd of 07, Dr. Camelgard gets a letter from the college that says, we are no longer going to proceed with the hearing. I'm paraphrasing the words. And that was it in terms of timeline and factual background. So the complaint was dropped. Well, it wasn't officially dropped because the Board of Regents has to approve any action of its committee. But for practical reasons, it never proceeded. In the ARDC and Judicial Inquiry Board, a complaint, someone makes a complaint, and that's confidential. We weren't before the ARDC. I'm talking about the college's ARDC. That's what I'm equating it to. Yeah. So it's confidential. It is supposed to be confidential. And the board then could bring in Dr. Murphy and say, doctor, you're skirting on the limits. We don't know. It could be the three. Well, do you know the rules at all? Pardon? Do you know the rules? This is what I'm asking. Well, it's supposed to be confidential, but it's been leaked out. Well, now when they stop doing it, like they bring in Dr. Murphy and they say, doctor, you're skirting on the limits, we want to admonish you. Okay, he says, and he walks out. He does the same thing three years later. That could be resurrected. Can it be resurrected or not, the initial complaint? What do you mean, Dr. Camelgard? You mean once they – quite frankly, it can be resurrected because the Board of Regents has not formally affirmed the action of its committee of this. Okay, say they did. Now, three years later, he goes out and he testifies about the same way. Can that first complaint be resurrected? He said it's res judicata. Well, quite frankly, under the administrative rules, and we really haven't looked into that, I'm not sure there's a res judicata or collateral estoppel effect to that first case. But to be quite honest, I don't know. That issue never came up at all. Can we get to the application of the Medical Studies Act here? Can we get to the Medical Studies Act here? Yes, absolutely. You said you were holding it off. Can we go on to that? Okay. Anyways, you know, as I said, the second prong, 30, this committee did not deliberate because if they did deliberate, they got the three names, which this court, in its prior opinion, in September of 2008, said we would be entitled to a petition to Rule 224. Now, the other point that I wanted to make was a position itself, but, Justice Coleman, let me go directly to your inquiry. The first prong of any analysis of the Medical Studies Act is, does it apply as a matter of law? The purpose of the Illinois Medical Studies Act is to improve or advance the quality of health care for the citizens of Illinois by allowing the medical profession an effective self-evaluation process. The purpose is not achieved by being a resident of Illinois that wants to use the Medical Studies Act. The purpose is not achieved by bringing a cause of action in Illinois against an Illinois resident. It can only be met when the activity reviewed is the practice of medicine that will improve or ensure the health care of the citizens of Illinois. To do otherwise, Your Honors, is to make the Medical Studies Act in Illinois a national peer review statute. I provided this court with, by way of example, a case out of the Supreme Court of California, the Milikowski case, excuse me if I'm butchering the first name of that case. But that case had before it its state statute. And the California Supreme Court said that that statute was for the benefit of the residents and citizens of the state of California. I just used that as an example. I will tell you that every case or every state that has a peer review statute, and it's all of them, has the very same purpose. The words to achieve that purpose differ, certainly. Illinois is no different in its purpose. Now the Institute of Medicine, which I'm sure we're all aware of, wrote in one of its books called To Err is Human, that peer review does not cross state lines. That's cited, too, in our brief. The Illinois Supreme Court, as well as the court of this district, and the United States Supreme Court, over the last 150 years, have said that health care is a matter of local concern for the citizens of the particular state. We know that peer review, or the peer review process, falls within this umbrella of health care for the citizens of the state. Now, I well recognize that we have to look to our own state statute to see how it's construed, as opposed to looking to some other state statute. But every other state has a statute, and the purpose of that state statute is the same. It's for the citizens of the state. Now, if our General Assembly, when it created our own state statute in 1961, wanted to make it a national peer review statute, it could have said so. The problem, of course, as we put forth in our reply brief, is that there is no history upon the enactment of the 1961 version of the Illinois Medical Studies Act. And it has been in existence for 49 years now. So we need to look at the statute as a whole, its objectives, and its nature, because the geographical limits are not stated in the statute. Now, I was given the link to bring the Illinois law on statutory construction up to date with the Nola Wilson case and the Lemonese case out of this district. But it's because I cited to the Niven case, which I litigated 25 years ago on allied medical societies. And that's really the only case in Illinois on dealing with allied medical societies, but not precisely the point at issue in this case. But it's looking at the statute as a whole, its nature and its objectives. And, of course, looking at different interpretations of the statute. Well, the Illinois Medical Studies Act is composed of five sections. Principally, we see in cases the first section, 2101. So in our reply brief, we probably did some research that's never been undertaken, at least in a public sense that I could find, to show that the Illinois statute pertains to Illinois and pertains to the benefit and welfare of the citizens of the state of Illinois. Now, I'll try to crunch that down in just a couple of minutes, Your Honors. The description, allied medical society, is found in the first and third sections of the statute. It was put in there in 1961. Why, I don't know. And for the lower court to have assumed something in Her Honor's decision, or our opponents to say, well, clearly the Illinois General Assembly intended to put allied medical societies in because of X. Well, that's mere conjecture. The allied medical society is found in the first and third sections. If we looked at the third section of the statute, we find that there are four entities that are described. Allied medical society, Illinois State Medical Society, hospital committees are also listed in there as well. So we have entities that are found in both. Oh, and the fourth one is the Illinois Department of Public Health. Well, if we take a look at the websites, as we did for the Illinois Department of Health and the Illinois State Medical Society, it says those agencies or entities are for the benefit of the people of the state of Illinois. And I'm paraphrasing the words, but it's right there. The Illinois State Medical Society is for the benefit of the doctors in our state. The third one is committees. Now, in the third section of the statute, it's committees of in-hospital committees, and in the first section it talks about licensed and accredited committees. Well, we know from the Roche case that a committee is defined by group or body. And we know from my Niven case that we took to the Supreme Court 25 years ago that the Supreme Court looked to the fifth section about penalties if you unlawfully disclose materials. And our Supreme Court said, well, how else are Illinois hospitals going to be accredited, pursuant to Section 1's description, if we don't allow them to hand over material? And in this case it was the Joint Commission, and at the time it was the Joint Commission on Accreditation of Health Care Organizations, in order to be licensed. So our Illinois Supreme Court said the fifth section really has to do with accredited committees of Illinois hospitals. Well, again, the nexus is Illinois. Now, this first section of the statute has 13 entities, including a number of committees of the hospitals. It also has an entity called insurance companies. And prior to that time, the entity was interinsurance exchanges. And I'm using that as an example. It's cited in our brief. Well, we know from the legislative history, which we have put in our appendix, that the Illinois State Medical Society, and amicus in our case, went to the legislature and says, well, we changed interinsurance exchanges to our insurance companies. And that's the reason we have the phrase insurance company. Now, I took three other amendments to the Medical Studies Act by way of example, and they all focus back to Illinois, Illinois, Illinois. Excuse me, counsel. Again, I want to focus on your argument that Illinois law doesn't apply. Okay. Given, Your Honor, the background that Illinois law does not apply as the first prong, as a matter of law, Dr. Camelgard, as we know, and I'm repeating the facts, testified in New York as a medical expert regarding patient care provided by a New York doctor to a New Jersey patient. Those are the facts. I mean, nobody disagrees with that. That does not impact on health care for an Illinois resident or Illinois citizen. And as proof of that, not because I say so or logic may dictate that, but I asked Dr. Collicott in his deposition, which is of record in this case, and he said, well, a patient in Illinois could read the Chicago Tribune, but he didn't use that, but a media piece, who somehow picked up a media piece from the state of New York who covered Dr. Camelgard's testimony, and the Illinois citizen would tell his or her doctor, I don't want to follow what you're telling me to do. I'll follow Dr. Camelgard because this is the way he testified. Your Honors, with all due respect to Dr. Collicott, that's just full of holes.  Why? Why? Because to have an Illinois citizen go through four or five hoops hypothetically and then go against the Illinois doctor that's treating him or her would mean, therefore. Well, didn't your client testify about the standard of care? He testified about a standard of care regarding treatment in New York, and he's from New Jersey. This is an Illinois doctor. Pardon? This is an Illinois doctor. He comes back here and says, gee, I disagree with what you just testified. I'm sorry, Dr. Camelgard's not an Illinois doctor. Oh, I'm sorry. He is from New Jersey. Dr. Camelgard has no connection with the state of Illinois. He brought a case here. Yes, but because he brought a petition here does not trigger the purpose of the Medical Studies Act. And when he brought a case here, he is a fellow of the ACS, and doesn't it say that any action brought has to be governed by the state? If you bring a case in the state of Illinois, it doesn't trigger the purpose for which the General Assembly created the statute. If he brings a case here against a resident of Illinois, it doesn't trigger the purpose of the Illinois Medical Studies Act created by the Illinois General Assembly. One other point, Your Honors, I mentioned the statutory construction part of it. There are four cases, or five cases, that we've cited in our briefs, starting with Jenkins v. Wu, 1984, Illinois Supreme Court, all the way to the Frigo, F-R-I-G-O, case of 2008. And those cases say that the Medical Studies Act is related to the benefit of the citizens of the state of Illinois. So we have case law. And, in fact, three out of the four appellate cases besides Jenkins comes from this district as well. So, and again, the Illinois General Assembly, through our statutory construction, did not intend for the Illinois statute to become a national peer review statute. There is no national peer review statute in this country. And, as I said, each state governs its own health care. Now, Judge Dooling said, well, if testifying impacts health care, I'm paraphrasing, okay. Well, number one, then, this court is being asked to tell the state of New York that testimony in the state of New York impacts health care in the state of New York. Health care is local. With all due respect to this court, it's going way beyond its jurisdiction, just like an appellate court in New York telling Illinois how we should interpret our own state statute. The bottom line on this point is I don't disagree with doctors policing themselves for the betterment of the citizens of the state. But the Illinois statute was the wrong statute to have used. If anything, it would have been the New York statute, and I'm not getting into whether that would apply or not. But that's where it comes down to. And our Illinois Code of Civil Procedure allows us, allows our trial courts throughout the state, to look to foreign law under 5-8-1006, recognizing that law. So it's not like, you know, we're trying to tell this court avoid, you know, doctors policing themselves. The answer is, of course not. Now, you know, the Allied Medical Society has to have been included in our statute. You know, taking the third section of the statute, where there's four entities, as I mentioned moments ago, three of them certainly pertain to Illinois. The fourth one is Allied Medical Society. Well, we do know, as a tenet of statutory construction, that we need consistency across all sections of the statute. Well, if three in Section 3 pertain to Illinois, wouldn't the fourth one have to pertain to the benefit of the citizens in Illinois? And the answer is certainly. So whatever avenue we look at in the analysis of does the Medical Studies Act apply as a matter of law, it all comes back to the state of Illinois. Whether it's by case law, statutory interpretation, what the United States Supreme Court has said, Illinois Supreme Court has said that health care is local and that we have to look to benefiting the citizens of the state. You know, there are other cases out there that say the same thing about that state statute. I mean, so it's nothing different, you know, in that respect. So I hope I have addressed, Justice Goldman, your position on that. If not, I think we're okay. I just want one more question. It's the college's position, and the trial court seemed to have found the same way, that the information about the peer review process is kept strictly confidential. It wasn't kept strictly confidential. I mean, that's what they said. I'm not too sure who disclosed it. It seems like your client made it public in all these lawsuits. Our client didn't make it public at all. Okay. I mean, I — Well, if it is kept strictly confidential, say, like, within religions, they can discipline each other, and that's protected by the First Amendment. All right. But if it's kept like that, within the profession, and it's not — and it's not — the information is not released to anyone. Well, quite frankly, if you're brought up on charges, and you should not have been, there's a cause for that. But it's strictly within a small community of disciplinary people. Well, it's a huge community, Your Honor. It's 70,000-plus — Does it mean like every doctor now knows just because a complaint was filed? Well, I will put it to you this way. We have definitive evidence that at least one doctor and more, but this one doctor from Shreveport, Louisiana, knows, who's a member of the college and is not involved in this process. But that remains to be developed for discovery in this case. But I will tell you that there's — as we set forth in the petition that we had before this court back in 08, which hasn't changed except for the fact that, you know, we're just seeking the identities of three people. You're basically saying the mere filing of complaint entitles you to discovery of all the information upon which that complaint is based. Well, the filing of the complaint and the investigation, which was wrongfully done after seven months of — The mere filing of the complaint entitles you to discovery. Under Rule 224, we are entitled to identities of those who may be responsible in damages. I'm quoting pretty accurately what 224 says. Our petition, which is the same petition as this Court had — I mean, Justice Murphy had — This is the issue I understand. The mere filing of complaint entitles you to discovery. Is that what you're saying? At that point, because it was wrongfully filed. Whether or not it's wrongfully filed — No, that's a question of fact, okay? But you're saying the mere complaint entitles you to discovery. So it's the wrongful investigation by three people that is — Well, see, it's not wrongful. See, it's a true charge. When are you entitled to discovery? You're saying the mere filing of complaint, you're entitled to discovery. Well, the mere filing is — caps off the process. So if, in fact, you say if you didn't have the filing of the complaint, would you necessarily be entitled to discovery? And the answer is I'm not sure. Okay? But the fact is he was charged with unlawful, unprofessional conduct. As I said, we — you know, when we were for the — Well, you have to link it with the investigation. But I would agree with you that — But without discovery, how can you find out if it's true or false? Well, because we know from our workup of the case, or before we sought discovery, but — I mean, the fact is that he was charged by three individuals — I'm sorry, not charged. He was charged by a committee. Committee, yeah. That went to three individuals that did some sort of investigation. We wrote one letter. All of a sudden, the committee stays the charges for hearing, and then the hearing doesn't proceed. Yet the documents didn't change one iota. That we do know. And I believe that letter is in the file. So, you know, in terms of are we entitled to names of three individuals who may be responsible in damages, the answer is yes, based upon the totality of — Okay. Yeah, so — Why don't you save the rest for rebuttal? Okay, very good. Your Honors, thank you. Thank you. Your Honors, Counsel, may it please the Court, my name is Steve Mandel on behalf of the ACS. The trial court here was right in its determination that the MSA applied to Dr. Camelgard's petition, and there should be no issue with the application. of the Illinois Act here. The ACS is an allied medical society based in Chicago. There's no dispute about that. The ACS sets standards for expert testimony for its members in malpractice actions. Dr. Camelgard voluntarily joined the ACS and pledged to abide by its rules, regulations, and bylaws. Now, as Justice Posner recognized in the Austin case, and Judge Dooley in the trial court recognized below, members of the allied medical society such as the ACS use that designation to boost their credibility when they testify. And the ACS bylaws require the application of Illinois law to any action filed against the ACS in any court. Now, the peer review proceeding initiated by the ACS against Dr. Camelgard was issued out of Illinois. Dr. Camelgard hired an Illinois attorney to respond. Dr. Camelgard then filed his Rule 224 petition in an Illinois court that he used a procedural device that's governed by the Illinois Code of Civil Procedure. The Illinois Medical Studies Act is part of the Illinois Code of Civil Procedure. And there's nothing in the MSA, the Medical Studies Act, that says that the conduct that has to be the subject of the peer review must occur in Illinois. Now, counsel has cited a lot of cases that mention not legislative history, but mention that this will improve health care in Illinois. Well, all of those cases deal with hospitals and hospital peer review committees, which are necessarily local. None of them deal with allied medical societies, such as the ACS or the AMA, that have thousands of members across the country, including those outside of Illinois. So if the court were to adopt the petitioner's, Dr. Camelgard's, interpretation, then any time a peer review proceeding would come in, the allied medical society would have to do some sort of conflict of law analysis to figure out what law applies. And we suggest that that would just be unworkable. The allied medical society in this case has made it clear to its members that they agree to abide by the application of Illinois law as set forth in the bylaws. Now, here the trial court properly determined that the Medical Studies Act protected the information that Dr. Camelgard was seeking in his Rule 224 petition. That's the identities of the three bariatric surgeons that were involved. And they talked about a chilling effect. How would the disclosure of these, quote, I'm going to use the word experts, how would they have a chilling effect? Well, Your Honor, because in Jenkins v. Wu, the Illinois Supreme Court case that counsel cites, recognizes that if physicians who would volunteer their time to participate in these. But when they volunteered their time, they say there's potentially a complaint and there's potentially a hearing. Their names had to come out in discovery. Well, Your Honor, I don't think that they would. I think that's one of the purposes. I mean, I can say, counsel, you're charged with violation of the canons of professional conduct. You say, okay, let me defend myself. I say, I have an expert that says so. Who is that? I have to question him. I want to take some depositions. I say, no, no, no, I don't have to. Doesn't the Constitution allow them to confront witnesses? And isn't this witness the witness that testified, hey, you violated some rules of ours? I think that the procedures before the college provide for an opportunity to know the charge and to respond to it. And that's what happened in this case. Dr. Campbell-Gard hired counsel, responded to the complaint, and the complaint was dropped. You're saying the mere filing the complaint does not entitle you to discovery. That's correct, Your Honor. What I'm saying is that the information that is considered in the peer review process is privileged and not subject to discovery under the Medical Studies Act. So I have to go to a hearing not knowing who testified against me, what these experts said. I can't question them on their analysis. Well, these experts are not testifying against Dr. Campbell-Gard. They're providing an analysis to the CJC to determine whether or not a charge should be brought. And then Dr. Campbell-Gard, knowing those charges, has an opportunity to go to a hearing. He has an opportunity to produce witnesses, deduce evidence, challenge the charges in any way he sees fit. It's not like the bariatric surgeons who were consulted here testifying against him behind a curtain where he doesn't have the right to cross-examine them. But the panel, I can understand, the panel sat there and they said, I don't know what to do, so they call in experts. They said, what should we do? And the expert said, well, we think the standard of care is. And so they said, okay, independent of all that, we are voting to complain. What I think the, without getting into the substance of what they said, the issue here was whether Dr. Campbell-Gard had expertise in the area that he gave testimony. So testimony was reviewed from the mental practice trial. And then since the members of the committee did not have an expertise, they said, okay, let's go to a hearing. They wouldn't be able to assess that matter. So I don't believe this is a situation where, as I said, these experts were consulted for purposes of testimony against Dr. Campbell-Gard. I think it's for a very limited purpose. And if you look at the words of the statute, and I think in interpreting a statute, that's where we have to start, the MSA, first of all, has no geographic limitations. In terms of its applicability, it doesn't say anything about Illinois law. And one would wonder, as Judge Dooling did, why would you include medical societies in there that have a diverse membership if the application was limited to Illinois? It says, all information or data of allied medical societies used in the course of internal quality control or of medical study for the purpose of improving patient care. And I think what happened here clearly falls within both the letter and the spirit of the MSA. The purpose of the MSA is to foster peer review. And if these individual physicians knew that they would be subject to disclosure, subject to lawsuit, Dr. Campbell-Gard is already on his third lawsuit here, who would come forward and participate in the process? Which ultimately, your position is, which ultimately harms all of the citizens, not just of Illinois, but throughout the country. That's correct. I mean, as Judge Posner recognized in his Austin case, which is a similar case, you know, testimony is a type of medical service. Judges rely on the testimony of experts to determine the standard of care. And so I think allied medical societies ought to be applauded for handling their cases. And for having peer review committees to make sure that testifying physicians meet those standards. Let me just respond briefly to the argument that somehow Dr. Collicott was not a member of the committee, and therefore that has some impact here. First of all, this committee requirement really doesn't pertain to allied medical societies. It really pertains to the committees of hospitals, surgical centers, and similar facilities. So it's really not an applicable argument. Secondly, it's form over substance. Dr. Collicott's affidavit is clear, and that's in the record at Volume 3, 731, paragraphs 3 and 15. He's in charge of the Central Judiciary Committee. He's responsible for its administration. He's a representative of the committee and authorized to speak on their behalf. So I think to suggest that somehow the committee is separate from Dr. Collicott is form over substance. And then finally, this is an argument that was never raised in the trial court, let alone in the opening brief in the appellate court. So we maintain that that argument is waived. To answer Your Honor's question on whether anybody made anything public, there's nothing in the record that suggests that anybody from the college made anything about this proceeding public. In fact, it was Dr. Collicott who filed his Rule 224 petition that published all the information about the proceeding. In fact, which maybe is a good segue into the other issue in this case, and that is whether or not the trial court properly terminated the Rule 224 petition. And we think she did here, because the purposes of Rule 224 are not in debate here. It's really to identify people responsible for a harm, not to build a case for it. It's a case for responsibility. And here we think that the petitioner has to make some threshold showing of a cause of action. And we don't think that one was made in this case. If you look at the petition, the only allegation is in paragraph 14 of the petition that a charge was made, later dropped, and therefore the petitioner was somehow damaged by it. And we don't think that meets the threshold. And in fact, if you look at the Beal case, that says that in determining the permissible scope of discovery under 224, the court has to look at the nature of the cause of action alleged. Well, how does this usually come up? It usually comes up when you have an accident in the operating room where the plaintiff knows that they're injured, right, but they don't know who had control of the operating room. An accident at a construction site, right, where you don't know who had control of the site. Here we don't have that situation. In fact, we have the unusual situation where Dr. Camelgard filed a federal court lawsuit during the pendency of his 224 petition alleging defamation and invasion of privacy. Both those claims were dismissed under much more liberal federal court pleading rules. So when Judge Dooling determined that he hadn't established a basis, any basis to show that someone may be liable to him, she was absolutely correct. Counsel, just to clarify. Sure. If the trial court found that all these proceedings were confidential, at what stage, if ever, would they become public? He's charged with a complaint was filed. And the complaint is that he did something wrong. The peer review proceeding would remain confidential if you look at Dr. Collicott's affidavit, which is part of the record. Okay, so it's all confidential. And it remains confidential. I suppose if they said your license is suspended, then it would become public. But it remains confidential. And he's entitled to discovery before the hearing of some sort? You know, Your Honor, I could not say, since it never got to that point, what the procedure would be. I know he would be entitled to a hearing in front of the CJC to state his position. And I know that the CJC considered the arguments of his counsel and ultimately dropped the case. But what we have here is a situation where he's taken alternative approaches. He filed the 224 petition. Then he filed the federal lawsuit. He's acknowledged that any claim he would have for defamation or invasion of privacy in the statute of limitations is run. And now, subsequently, he has filed another suit in the circuit court alleging breach of contract and then, curiously, intentional infliction of emotional distress, arising out of the peer review proceeding that was ultimately dropped. So it sets up an unusual situation where 224 is the statute of limitations. It's designed for pre-suit discovery. And here, assuming he'd have the opportunity for discovery, he'd have the full panoply of rights that he would have under the general discovery rules in those cases. Thank you, counsel. We have no further questions. Thank you, Your Honor. Thank you, Your Honors. Our petition, rule 224 petition, as I mentioned to the court, does not change from the last time this court had it, except that we are seeking three names. But on page 1587, volume 7 of the record, it does not change from the last time this court had it, except that we are seeking three names. We set forth in nine paragraphs, in a descriptive way, the reasons for seeking the discovery that we were seeking. And at the bottom of that page, we set forth paragraphs A through I, various causes of action. I believe that document was filed in January of 08. And, indeed, because of a statute of limitations problem, we used two of those causes of action. And in a subsequent case, which has been stayed. But because Judge Dooling ruled as she did, she entered a final order that collaterally stops us forever, unless we get relief from this court, from uncovering the names of the three individuals who acted as a consultant. Judge, Justice Gordon, in the Beal case, in footnote 3, and we've noted that in our briefs, had the same situation. Only then, it was by a party named Edgemark Corporation, who claimed that the individual could not get the names of the consultants, because there was a pending case at the time that the petition was ruled upon. And Justice Gordon, ruling for a unanimous court, disagreed with Edgemark. This is the situation that we have here. Excuse me, counsel. Maybe I'm simplifying this. As you have told us, Dr. Camelgard, in your argument, has no connection here to Illinois, other than the fact that he's filed this case. Is that correct? No connection in Illinois, other than this. So he's filed this case. He is citing his right to bring this action under Illinois Supreme Court Rule 224. Is that correct? Yet, the Illinois Medical Studies Act shouldn't apply, because he's not connected with Illinois. That's the basis of your argument? No, the basis of my argument, Justice Coleman, is that the Illinois Medical Studies Act does not apply, because the facts of this case are not consistent with the purpose of the Illinois Medical Studies Act. Well, you yourself talked about how you have emphasized previously that he filed this case. He doesn't have a connection, and nothing that he has done regarding this case has a connection. Because, sorry. No, go ahead. The purpose of this Medical Studies Act is to ensure or enhance or improve or maintain health care for the citizens of Illinois. The facts in this case have nothing to do with improving health care for the citizens of the state of Illinois. Even though the issue of making sure that the peer review process is maintained ultimately does help the people of the state. The peer review process is a general proposition. It's intended for the state of Illinois to improve, maintain, ensure health care for the people of Illinois. That is a proposition. If you put it to California or Idaho or Florida, that would be the same proposition or the same purpose. But when you testify in New York regarding a patient from New Jersey who was treated in New York, that has no nexus to the state of Illinois to ensure that the people of Illinois are protected in terms of health care. Your Honors, a couple more points. One is that in terms of the names of these three individuals, now there was a leak of confidential information. And certainly that the leak and everything gives rise to a cause of action. And again, because Judge Dewing entered a final and appealable order, we're of course stopped from getting that discovery. Which I believe in reading this Court's earlier opinion, we would be entitled to if those three names were in the documents that were tendered to Judge Kogan, the earlier trial court judge. And they indeed were and had to be in those documents. So relying upon stare decisis, if the names were there, we should be entitled to them because our petition didn't change. And I'll quote from the decision. The letter drafted by Respondent's Counsel to the trial court hints that the documents contain the names of the consulting surgeons, comma, which petitioner would have been entitled to under Rule 224, close quote. I believe Justice Murphy wrote the opinion for the Court at that time. The counsel mentioned this federal case about being dismissed. Well, he didn't quite complete the sentence. It was dismissed without prejudice relief to undertake additional discovery. But this matter has intervened. As far as Dr. Collicott not being a committee member, although in his affidavit he described what he does. The committee members are selected by the Board of Regents. Dr. Collicott was acting as an employee, a senior staff member who administrates. I'm pretty familiar with that counsel. Do you have any final point? That's it, Your Honor.